Filed 11/23/20  P. v. Solomon CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B299423 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA469798) |
| v. | |
| DONTE SOLOMON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed as modified.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

A jury convicted defendant and appellant Donte Solomon of second degree murder (Pen. Code, § 187, subd. (a)[1]), attempted murder (§§ 664/187, subd. (a)), shooting at an inhabited dwelling (§ 246), and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury found true the allegations that in the commission of the murder, attempted murder, and shooting at an inhabited dwelling defendant personally used and personally and intentionally discharged a firearm causing death. (§ 12022.53, subds. (b)–(d).) Defendant admitted he suffered one prior serious felony conviction within the meaning of the Three Strikes law (§§ 667, subd. (d) & 1170.12, subd. (b)); five prior convictions within the meaning of section 667.5, subdivision (b); and one conviction within the meaning of section 667, subdivision (a)(1). The trial court sentenced defendant to 55 years to life in state prison plus 34 years. It also imposed a $120 court facilities assessment (Gov. Code, § 70373), a $160 court operations assessment (§ 1465.8, subd (a)(1)), and a $300 restitution fine (§ 1202.4, subd. (b)).[2]

On appeal, defendant contends the trial court erred in failing to instruct the jury on heat of passion voluntary manslaughter as a lesser included offense to murder, erred in failing to hold a hearing on his ability to pay the assessments and fine, and his section 667.5, subdivision (b) enhancements must be

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    The trial court also imposed and stayed a $300 parole revocation restitution fine. (§ 1202.45.)

stricken pursuant to Senate Bill No. 136 (Senate Bill 136).  We order defendant's section 667.5, subdivision (b) sentence enhancements stricken and otherwise affirm the judgment.

## II.    BACKGROUND

A.    *Prosecution Evidence*

In July 2018, Donniesha Gregory lived with two of her children in an apartment on Dalton Avenue in Los Angeles.  She was in a relationship with R.P.  Previously, she had dated defendant, a Black P-Stone gang member.  Gregory's friend C.C. had seen signs that R.P. was associated with the Rolling 60's gang.

On July 16, 2018, R.P. and C.C. visited Gregory at her home.  Gregory's cousin M.S. was there.  Gregory, R.P., C.C., and M.S. spoke for about an hour in Gregory's bedroom.  At some point M.S. left the room.

Just after M.S. left the room, C.C. and R.P. got up to leave, but then heard a "commotion"—someone was driving a car up and down the street and honking its horn.  C.C. heard defendant calling Gregory's name, trying to convince her to come outside.  Gregory asked C.C. and R.P. to stay.  R.P., who was armed with a nine-millimeter handgun, sat on an ottoman by the bedroom door.

At first, Gregory ignored defendant but eventually went to the window.  Defendant asked Gregory to open the door.  He then began yelling obscenities such as "'Fuck Naps'" and "'Fuck Crabs.'"  "Naps" was a derogatory term for the Neighborhood Crips gang and "Crabs" was a derogatory term for the Crips gang.

3

Gregory begged defendant to leave, saying that her children were in the home. Defendant responded, "'I don't give a fuck.'"

At about 9:45 p.m., Gregory's father and his friend arrived at Gregory's home. Before they entered Gregory's home, the father heard Gregory and defendant arguing. Gregory was asking defendant to leave—"like she still [did not] want to be bothered with him." The father tried to calm defendant, telling him, "'Man, save this for another day. You can come back tomorrow.'" The father's friend described Gregory and defendant's interaction as "talking" or "arguing."

R.P. got up from the ottoman and stood beside Gregory. C.C. surmised that R.P. was also going to try to convince defendant to leave. C.C. heard Gregory tell defendant, "'I don't care about a gun,'" and then gunshots. Gregory suffered a single, fatal gunshot wound to the head.

B.    *Defense Evidence*

Defendant testified that on July 16, 2018, he and Gregory were in an "open" relationship, which meant that they "saw" other people. At about 8:50 a.m. that morning, he went to Gregory's home to check on her—she did not have a cell phone and he had not seen her for three or four days. Gregory asked defendant for money. Defendant said he did not have money to give her, but would be able to give her some after work.

Defendant got off work at around 1:00 p.m. and went to Gregory's home to give her money, but no one was there. He then drove to a park where he stayed for about four hours and smoked a couple of marijuana "blunts" and drank a couple of beers. At about 4:00 p.m., he drove to Gregory's home, but she was not

4

there, so he went to a bar. He stayed at the bar for about five hours and had five or six shots of Remy.

Defendant left the bar and went to Gregory's home. He wanted to give her money and spend time with her. Although he was intoxicated, he was not so intoxicated that he could not drive or understand what was going on. Before he pulled into the driveway, he turned off his headlights. Whenever he prepared to park, he turned off his headlights.[3]

When defendant pulled onto Dalton Avenue, he saw R.P.'s Land Rover parked on the street. Defendant met R.P. through Gregory—she had been R.P.'s methamphetamine dealer when she lived with defendant. Seeing R.P.'s car made defendant feel "a little like on edge . . . a little afraid." The reason for defendant's fear was that a couple of months prior, he and R.P. had an "issue" near a gas station when R.P. jumped out of his car, pulled a silver gun, and told defendant he was going to "'bust'" on defendant—meaning he was going to shoot defendant. Defendant got into a car driven by defendant's "other girlfriend" W.M. and they drove away, chased by R.P. Due to W.M.'s "slick driving," she and defendant were able to escape.

Although defendant had not had other "issues" with R.P., it had been awkward for defendant when he was released from prison and learned that R.P. was living with Gregory. He really did not like it, but understood that "when you go to prison, sometimes, you know, things happen." Even though R.P. was staying with Gregory, defendant "didn't have a problem with [Gregory] or anything."

---

[3]    On cross-examination, defendant admitted that a surveillance video of his car pulling up to Gregory's home showed his headlights were turned off down the street.

Despite his fear of R.P., defendant pulled into Gregory's driveway and got out of his car. Defendant was a little disappointed and felt disregarded when he saw R.P.'s car. He thought Gregory was disloyal for allowing R.P. into her home after R.P. had pulled a gun on him and also on Gregory and her family members, but he was not mad at her. Defendant wanted Gregory to come outside and tell him when her company was leaving and when he could see her. Because she did not have a telephone, he had been unable to speak with her—he really cared about her and loved her.

Gregory came to the window, and defendant expressed his displeasure that R.P. was in her home. Out of jealousy and fear, he said foolish things like "'Fuck Crabs.'" Defendant was holding a nine-millimeter, semiautomatic handgun because he knew R.P. was there and he was afraid. He had the handgun with him because he had been shot, stabbed, jumped, and threatened by people with guns in the past.

At some point, R.P. appeared in the window with a silver object in his hand. Because R.P. had previously pulled a silver gun on defendant, defendant believed the object was a gun. R.P. was pointing the gun out of the window at defendant. Defendant was afraid.

When defendant saw R.P. pointing the gun at him, he fired a shot "up towards the air," not trying to hurt anyone, but as a warning to R.P. to move away from the window. Defendant's finger remained on the trigger, and when he leaned toward his car because he was in danger, he fired a second shot by accident—his handgun was a semiautomatic and "sometimes, they just shoot on their own." He did not shoot at the window or

to kill anyone when he fired the two shots.  Instead, he fired his gun because he was concerned for his own safety.

Defendant got into his car and drove away.  He returned because he heard a shot after his second shot and then heard Gregory scream.  As he drove up, however, he saw someone running down the driveway and he heard a couple of shots, so he drove away.

## III.  DISCUSSION

### A.  *Heat of Passion Voluntary Manslaughter Instruction*

Defendant argues that the trial court erred by failing to instruct the jury on heat of passion voluntary manslaughter as a lesser included offense to murder.  We disagree.

### 1.  Standard of Review

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  A trial court must instruct, sua sponte, on all theories of a lesser included offense that are supported by substantial evidence, but not those without such evidentiary support.  (*Id.* at p. 162.)  "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is "'evidence from which a jury composed of

7

reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed.  [Citations.]"  (*Ibid*.)

2.	Legal Analysis

Heat of passion voluntary manslaughter has an objective element and a subjective element.  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  The objective element is satisfied when the victim engaged in conduct "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  (*Id.* at p. 550; *People v. Lee* (1999) 20 Cal.4th 47, 60 ["The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment"].)  The subjective element is satisfied when the defendant "killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]"  (*Moye, supra*, 47 Cal.4th at p. 550.)

Defendant contends the elements of heat of passion voluntary manslaughter were present because he was in a romantic relationship with Gregory; he went to Gregory's home where he found his rival, R.P.; and he exchanged angry words with Gregory when she would not let him in the house.  Further, he yelled obscenities at R.P. and fired his gun only when R.P. came to the window.  According to defendant, "there was strong evidence that [defendant] was provoked by seeing his love interest with his rival and was overcome with jealousy and anger."

There was not substantial evidence of the subjective element of heat of passion voluntary manslaughter to require a sua sponte jury instruction.  Defendant testified that he and

8

Gregory were in an "open" relationship—they dated other persons. He knew before he went to Gregory's home that Gregory was dating R.P. and, although he did not like that they were dating, he understood that things sometimes happen when you go to prison. Defendant was not mad at Gregory when he saw R.P.'s car at her home. He fired the first shot in the air, and not at the window, to warn R.P. to move away from the window. He fired the second shot accidentally. Given the evidence and "defendant's own testimony, no reasonable juror could conclude defendant acted ""rashly or without due deliberation and reflection, and from this passion rather than from judgment . . ."' [citations]' [citation] . . . ." (*Moye, supra*, 47 Cal.4th at p. 554.)

B.    *Ability to Pay Hearing*

Defendant next contends the trial court violated his due process rights and his right to be free of excessive fines by imposing the $120 court facilities assessment, $160 court operations assessment, and $300 restitution fine without holding a hearing to determine his ability to pay. He argues that if he forfeited his claim by failing to object in the trial court, then he received ineffective assistance of counsel.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the court held, "[D]ue process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.) It further held that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability

9

to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

"Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) This forfeiture doctrine applies where a defendant fails to object to the imposition of fines and fees at sentencing. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Avila* (2009) 46 Cal.4th 680, 729.) Defendant failed to object at his sentencing hearing to the trial court's imposition of the assessments and fine without a hearing to determine his ability to pay. Accordingly, he has forfeited this issue.

Citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–688, defendant contends that if we hold he forfeited his challenge to the trial court's imposition of the assessments and fine without an ability to pay hearing, then defense counsel provided ineffective assistance by failing to object before the trial court. To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective

assistance are more appropriately resolved in a habeas corpus proceeding.  [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

The record is silent as to trial counsel's reasons, if any, for failing to object to the trial court's imposition of the assessments and fine without a hearing to determine defendant's ability to pay.  Further, there is at least one satisfactory explanation of counsel's failure to request an ability to pay hearing.  Defendant had been sentenced to a lengthy term in custody and his probation report reflected that there was "NO INDICATION OR CLAIM OF SIGNIFICANT PHYSICAL/MENTAL/EMOTIONAL HEALTH PROBLEM."  Thus, counsel could have concluded that defendant was able to pay his assessments and fine.  (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490 [relevant factors regarding ability to pay "may include, but are not limited to, potential prison pay during the period of incarceration to be served by the defendant"], fn. omitted; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 ["[w]ages in California prisons currently range from $12 to $56 a month"].)  Under these circumstances, defendant cannot prevail on his appellate claim of ineffective assistance of counsel.  (*Mai, supra*, 57 Cal.4th at p. 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

C.      *Section 667.5, Subdivision (b) Sentence Enhancements*

On October 8, 2019, the Governor signed Senate Bill 136, which became effective on January 1, 2020.  Senate Bill 136 amended section 667.5, subdivision (b) to provide, in relevant part:  "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of

11

imprisonment in a county jail . . . is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of [s]ection 6600 of the Welfare and Institutions Code . . . ." Thus, Senate Bill 136 amended section 667.5, subdivision (b) to eliminate the one-year sentence enhancement for prior prison terms other than those imposed for sexually violent offenses.

Defendant contends that we should strike his five,[4] stayed, one-year section 667.5, subdivision (b) sentence enhancements as none of his prior prison terms was served for a sexually violent offense.[5] The Attorney General acknowledges that Senate Bill 136 is retroactive under *In re Estrada* (1965) 63 Cal.2d 740 and agrees that defendant's section 667.5, subdivision (b) enhancements must be stricken. We agree with the parties. Accordingly, we order the section 667.5, subdivision (b) sentence enhancements stricken.

---

[4] Defendant was charged with and admitted five section 667.5, subdivision (b) prior convictions. The trial court sentenced defendant on only four of those admitted prior convictions. Our opinion encompasses all five prior convictions.

[5] Defendant's five prior convictions were for unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)), possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), criminal threats (§ 422), and felon in possession of a firearm (first under § 12021, subd. (a)(1) and later under § 29800, subd. (a)(1)).

## IV. DISPOSITION

The judgment is modified to reflect that defendant's one-year enhancements imposed under 667.5, subdivision (b) are stricken. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.


We concur:


RUBIN, P. J.


MOOR, J.

13